IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

**FILED**

3:11 pm, 2/24/23

**U.S. Magistrate Judge**

UNITED STATES OF AMERICA.,

Plaintiff,

vs.

SHANE M. HENNING,

Defendant.

Case No.  L:22-PO-00397-SAH

---

OMNIBUS ORDER ON MOTION TO SUPPRESS FOR LACK OF PARTICULARIZED
SUSPICION [ECF No. 22], MOTION TO SUPPRESS SEARCH WARRANT [ECF No. 23],
MOTION TO SUPPRESS REFUSAL AND CONTEMPT [ECF No. 24],
MOTION TO SUPPRESS STATEMENTS [ECF No. 25]

---

Before the Court are four Motions to Suppress filed by Defendant, Shane Henning. ECF Nos. 22, 23, 24, 25. The Court will address all motions together in this Order due to overlapping factual issues.

Considering the Court's findings below, the Motion to Suppress For Lack of Particularized Suspicion [ECF No. 22] is DENIED, the Motion to Suppress Search Warrant Faulty and Stale [ECF No. 23] is DENIED, the Motion to Suppress Refusal and Contempt Right to Exculpatory Evidence [ECF No. 24] is DENIED, and Motion to Suppress Statements [ECF No. 25] is DENIED.

## FACTS

In mid-June an unprecedented flood washed out portions of Highway 89, which provided access to Yellowstone National Park [YNP] from Gardiner, Montana. Due to the highway's destruction, from late June through October 2022, the Old Gardiner Road [OGR] was the only route available between Mammoth Hot Springs, Wyoming and Gardiner, Montana. The road was restricted to National Park Service [NPS] employees, other park employees, residents, contractors,

and commercial use authorization tour guides. The travel times were limited to 15–to–30-minute windows, depending on the day—either two or three times a day, going from Gardiner to Mammoth and visa-versa. Travel was not permitted outside of the prescribed times due to movement of heavy equipment and active road construction. The road was one-lane and traffic was restricted to one direction of travel during each traffic window. During the first several months of use, the OGR was a dirt road, very narrow, had hair-pin turns, large drop-offs, no guardrails, and extremely dangerous conditions. The entirety of the road lies within the boundaries of Yellowstone National Park.

On July 15, 2022, around 5:45 p.m., an NPS/YNP employee called the YNP Communication Center regarding a silver GMC Sierra pickup truck driving on the OGR. This was the last trip of the day from Gardiner to Mammoth, 5:30–5:45 p.m. The NPS employee communicated that he was following a truck that "left the roadway—swerving to both sides of the road—sideswiping sage, kicking up dust, and running into a curb by the Mammoth Hotel." The employee provided vehicle make and model, the color, the license plate number, the direction the vehicle was traveling and where it went in Mammoth. While the caller's identity was known, the caller asked to remain anonymous.

Based upon this information, law enforcement decided to initiate an investigation of a potential reckless or impaired driver. Ranger Drew Koschny was on patrol that evening and was the first to respond to the call and located the truck with the matching license plate number. The truck was parked across from the Mammoth Community Center, at a residence in what is called Lower Mammoth. The truck was unoccupied and was not running. At approximately 6:01 p.m., Ranger Koschny parked his vehicle slightly down the road from the pickup. He did not have any emergency lights operating on his vehicle and approached the area on foot in full uniform. He saw

a male and female standing on the front porch approximately 20 plus feet away. Ranger Koschny recognized the female as an NPS employee with whom he had previously worked with in a different area of the Park. He knew the truck did not belong to her. Ranger Koschny then received registration information from dispatch indicating the truck was registered to an individual by the name of Shane Henning. In an elevated voice, Ranger Koschny said, "Henning." The male, whose identity was later confirmed by his driver's license, was Shane Henning, the Defendant. Mr. Henning turned around and Ranger Koschny asked him to step off the porch so he could talk to him. Immediately, Ranger Koschny noticed Mr. Henning was unsteady on his feet. When Mr. Henning approached, Ranger Koschny smelled the odor of alcohol and noticed Mr. Henning's eyes were blood shot and watery. Mr. Henning stated the truck was his and he had been driving it on the OGR. Both men walked toward the parked truck and Ranger Koschny activated his body camera. *Mot. Hr'g*, ECF No. 44, Dec. 16, 2022, Ex. 1.

The conversation between Ranger Koschny and the Defendant continued as Ranger Koschny requested Mr. Henning's driver's license. Mr. Henning handed over his driver's license which Ranger Koschny keeps throughout the remainder of the stop. Mr. Henning's speech was indecipherable and slurred at times throughout the conversation. During the interaction, Mr. Henning leaned on his vehicle. Ranger Koschny told him, "Seems like you had quite a bit to drink; I can smell it on y[ou] and see the alcohol in the vehicle." The ranger talked briefly with Mr. Henning about damage to the truck, asked what he was doing in Gardiner, and how many drinks he had prior to coming up from Gardiner. Mr. Henning replied he had three beers at a local drinking establishment in Gardiner, and then bought a twelve pack of beer at the market and had opened one beer from the twelve pack when he got to Lower Mammoth.

At approximately 6:13 p.m., Ranger Hill in full uniform approached Ranger Koschny and Mr. Henning from the rear of the truck. Ranger Hill reported that he saw an open container of alcohol in the vehicle. A few moments later, Ranger Casey Lewis also arrived on scene.

Ranger Koschny returned to Mr. Henning after a brief discussion with Ranger Lewis, asked the timeline of Mr. Henning's movements and when he stopped drinking. Mr. Henning stated he drank three beers at the Rusty Rail and left that establishment at "about 4:45–4:46 [p.m.]" to make sure he was in line for the shuttle going to Mammoth. Mr. Henning's timeline included him being in line for the 5:30 p.m. Mammoth convoy at 5:08 p.m.

Ranger Lewis then asked the Defendant if he would consent to do some field sobriety tests [SFSTs]; Mr. Henning responded, "Because I'm dealing with my gout; that is very jurismental [*sic*]…It's just the gout is my main concern…The stepping foot is the only thing I'm worried about." Ultimately, Mr. Henning consented to perform the eye test, the Horizontal Gaze Nystagmus (HGN) test, and refused all other tests.[1]

Throughout the encounter, Mr. Henning was congenial and respectful to the rangers; continuously chattered about different subjects with hand gesticulations and leaned against the truck intermittently. After the HGN was completed, Ranger Koschny asked Mr. Henning if he would consent to a "PBT," a preliminary breathalyzer test, he refused and said, "I don't want to take the chance." Rangers Koschny and Lewis agreed they observed six clues on the HGN test, meaning they observed six out of six on the HGN for indicators of impaired driving. At 6:31 p.m., Ranger Koschny told the Defendant he was under arrest. Prior to handcuffing Mr. Henning, the rangers stepped away for further discussion.

---

[1] At the Motion Hearing, Ranger Koschny testified that the SFSTs are good indicators of an impaired driver. He used the example: four out of six clues on the HGN indicates there is an 88% chance the person is an impaired driver. *Mot. Hr'g.*, ECF No. 44, Dec. 16, 2022.

During a roughly fifteen-minute time frame, Mr. Henning continued to lean on his truck while rangers stood several feet from him and did not ask him any questions. At approximately 6:47 p.m., Ranger Lewis approached the Defendant and placed him in handcuffs. The rangers then secured the truck, groceries, and the Defendant's person. The rangers did not question Mr. Henning about his drinking or driving; rather they verified the truck was secure, all medication was gathered, and Mr. Henning's perishables were handled. At no time did any of the rangers advise Mr. Henning of his rights per the *Miranda* decision.

After arriving at the Mammoth jail, Ranger Lewis advised Mr. Henning pursuant to the federal implied consent law as follows:

1. You are under arrest for operating or being in actual physical control of a motor vehicle while under the influence of alcohol, or a drug, or drugs, or any combination thereof, to a degree that renders the operator incapable of safe operation.

2. Under Federal law, as the requesting officer, I have the right to select the type of test or tests you will be asked to take. For the purpose of this advisement, I am asking if you consent to take a breath test.

3. Under Federal law, a person in your situation is deemed to have given their consent to testing for alcohol and/or drugs.

4. If you refuse to consent to this breath test, an additional charge under 36 C.F.R. 4.23(c)(2) will be filed and additional penalties for that violation may result in up to a $5,000 fine and/or 6-month imprisonment.

5. If you refuse to consent to this breath test, your driver's license may be suspended, or there may be administrative penalties. You may have the right to an administrative hearing by the state licensing department before your driver's license is suspended. This may also apply to a commercial driver's license.

6. If you refuse to consent to this breath test, your privilege to operate a motor vehicle upon the special maritime and territorial jurisdiction of the United States (which includes Yellowstone

> National Park) will be denied for the period of a year beginning on the dates of arrest upon which the test was refused.
>
> 7.  Your test results or testing refusal may be used as evidence in a criminal trial. Additionally, if you refuse testing the presiding Judge may infer from your refusal that you were under the influence of alcohol and/or drugs. The inference is rebuttable.
>
> *Mot. Hr'g*, ECF No. 44, Dec. 16, 2022, Ex. 3.

After being read the advisement, the Defendant stated he understood the advisement, refused the test, and signed the refusal form. Approximately, two and a half hours later, the rangers obtained a search warrant for a sample of Mr. Henning's blood—to test for his blood alcohol level. The government alleges that the Defendant refused to comply with the search warrant. Based upon that refusal, the government filed a second case against Mr. Henning.

## PROCEDURAL BACKGROUND

The Defendant was charged via violation notices on July 15, 2022, with three counts related to this stop: 1) operating a vehicle while under influence of alcohol to a degree that renders the operator incapable of safe operation (36 C.F.R. § 4.23(a)(1)); 2)  refusal to submit to a chemical test for presence of alcohol (36 C.F.R. § 4.23(c)(2)); and 3) carrying an open container of alcohol in a motor vehicle (36 C.F.R. § 4.14(b)). ECF Nos. 1, 3, 4.[2] On July 18, 2022, the Court held an Initial Appearance on all the above referenced counts. ECF No. 6. He pled not guilty and later sought counsel.

In a separate case, *U.S. v. Shane Henning,* L:22-MJ-00048 (D. Wyo. Aug. 31, 2022), the Government filed a Complaint against Mr. Henning with one count of Disobeying or Resistance of a Lawful Order under 18 U.S.C § 401(3), alleging that Mr. Henning failed to comply with the search warrant issued by this Court for the collection of his blood for testing. The Court has

---

[2] Count 4, improper food storage, is from a violation notice issued on July 8, 2022, and is not applicable to the Motions to Suppress. ECF No. 5.

referred to that case as the "contempt case," and the current case as the "DUI case," to distinguish them. The Defendant did not file any motions in the contempt case.

At the motion hearing on December 16, 2022, the Court pointed out that none of the motions which appeared to also be directed at the contempt case had been filed in that case and extended to Defendant's counsel the opportunity to correct that oversight. Despite the Court's invitation, none of the motions were filed in the contempt case. Therefore, the Court will decline to address the contempt case or how these rulings may apply in that case since no motions were filed.

### Motion Hearings

The Court held two motions hearings on December 16, 2022, and January 20, 2023. *Mot. Hr'g.*, ECF Nos. 44, 47. At the first hearing, the Government called two witnesses: Rangers Lewis and Koschny. The exhibits admitted were: 1) the body camera of Ranger Koschny's interaction with Defendant [Ex. 1]; 2) the signed search warrant for the blood draw of Defendant [Ex. 2]; 3) the body camera of Ranger Lewis [Ex. 3].

Ranger Koschny was a seasonal NPS law enforcement ranger during the 2022 summer and is currently a deputy sheriff in Pennsylvania performing general law enforcement duties. He has been in law enforcement since 1983, when he went through Ohio's Peace Officers' Training Program—there he was trained in the HGN and detection of impaired drivers. A year later, he attended the Ohio State Highway Patrol Academy—where he was further trained in detection of impaired drivers. Subsequently, in 1987, Ranger Koschny went into federal service and attended the Federal Law Enforcement Training Center [FLETC] for criminal investigator school and agency specific training for the U.S. Marshals Service. He received training on dealing with people under the influence of drugs and alcohol and continued his education through the Marshals Service

until 2017. In December of 2019, Ranger Koschny completed his second round of FLETC training, this time at the NPS Seasonal Law Enforcement Academy—where he was re-introduced to SFSTs and spent 17-18 weeks being instructed on law enforcement techniques. As a seasonal ranger, Ranger Koschny enforced criminal laws within the Park's boundary under the Code of Federal Regulations [CFR]. He received further training on SFSTs and drug impairment through the Advanced Roadside Impaired Driving Enforcement [ARIDE] program in 2020.

Ranger Lewis is a fulltime law enforcement ranger for the NPS. He has been permanent since March 2019; seasonal since 2016; and in 2015 was a non-commissioned ranger. His duties involve enforcing the laws within YNP boundaries, making traffic stops, investigating crimes, and making sure people follow the rules of the Park. During July 2022, Ranger Lewis was assigned as a jailer at the Mammoth Jail—duties at the jail involved booking, monitoring inmates, and taking care of the administration paperwork. He initially attended seasonal training for NPS through the seasonal law enforcement academy; and once he was hired as a permanent employee, he attended the FLETC in Georgia. He completed and graduated from FLETC and proceeded to his field training, an 11-week program where he was paired with another officer.

Ranger Lewis has a bachelor's in environmental studies and mountain studies. He has extensive training on Driving While Intoxicated [DWI] enforcement through the National Highway Traffic Safety Administration [NHTSA] for administering the SFSTs. His training included classroom and in-person training. He continues his education each spring at the annual law enforcement training and "wet-lab." Ranger Lewis uses his skills in SFSTs to handle cases of DWI. He was the primary officer on many DWI cases and assists officers in many more DWI investigations.

At the hearing on January 20, 2023, the parties completed their closing arguments.

**Preliminary Rulings**

At the December 16, 2022, hearing, the Court first addressed Mr. Henning's Motion to Suppress Search Warrant Faulty and Stale. ECF No. 23. In particular, the Court addressed the claim that the search warrant omitted material information. Mr. Henning alleged that rangers intentionally omitted the fact that the Defendant had opened and consumed a partial beer after he had stopped driving. ECF No. 23 at 7. Under *Franks v. Delaware* and its progeny, a hearing on the veracity of an affidavit supporting a search warrant is only required if the defendant makes a **substantial preliminary** showing that the affidavit contains intentional or reckless false statements and the affidavit, without these statements, would not be sufficient to establish probable cause for the warrant. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Stewart v. Donges*, 915 F.2d 572, 582-583 (10th Cir. 1990) (extending *Franks* to include omissions of material facts). This Court determined the Defendant did not meet the burden under *Franks v. Delaware* for a hearing into the veracity of the affidavit supporting the search warrant. The Defendant failed to provide a "preliminary showing that [there was] a false statement [or omission,] knowingly and intentionally, or with reckless disregard for the truth, [] included [or omitted] by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56; *see also Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (claims of omissions in an affidavit require the court to add the omitted information into the affidavit and determine if it would alter the probable cause determination). Rather, the probable cause determination took into consideration the open container of alcohol in the vehicle, referenced in the affidavit. *Mot. Hr'g*, ECF No. 44, Ex. 2. While it did not state that

Mr. Henning claimed he had opened that beer after driving, the Court does not find this to be a material omission that would have altered the granting of the search warrant.

Ergo, that portion of Motion to Suppress [ECF No. 23] arguing the search warrant omitted vital information was DENIED.

DISCUSSION

**Motion to Suppress for Lack of Particularized Suspicion [ECF No. 22]**

In the Motion to Suppress for Lack of Particularized Suspicion [ECF No. 22], the Defendant argues the moment Ranger Koschny contacted Mr. Henning while he was standing on the porch, Mr. Henning was subject to an investigative detention and at that moment, law enforcement lacked the required particularized suspicion to justify such a detention. The Defendant argues that rangers did not have "particularized suspicion" to stop Mr. Henning since law enforcement did not witness the Defendant driving, the information provided was from an anonymous caller, and even if the caller provided the license plate, model, and color of vehicle—rangers failed to corroborate the information. The defense contends that rangers did not have justification to stop or interact with Mr. Henning, rather since the caller wanted to be left unidentified and did not provide predictive information, there was zero indica of reliability that the anonymous caller was honest. Therefore, the Defendant argues, all evidence from the encounter must be suppressed due to the invalid initial stop.

The Government contends that the initial interaction with Mr. Henning was a consensual encounter, and that Mr. Henning had the right to refuse to interact with Ranger Koschny but chose to interact with the ranger and answer questions. The Government asserts that once Ranger Koschny asked for and received Mr. Henning's identification, the encounter developed from consensual to an investigative detention supported by a reasonable articulable suspicion at that

time. The Government cites *Navarette* for the proposition that an anonymous call can provide sufficient information that rises to the level of articulable suspicion, and it existed here considering the totality of the circumstances. The factors outlined by the Government are: 1) the caller was not actually anonymous; 2) the caller provided a great amount of detail including the make, model and color of the vehicle, the license plate number and the direction of travel and specific driving concerns; and 3) Ranger Koschny waited until he determined alcohol was a factor.

### The Fourth Amendment and Law Enforcement Encounters

The Fourth Amendment protects "[t]he right of the people to be secure in their persons…and effects, against unreasonable searches and seizures." USCS Const. Amend. 4. Different encounters between the public and law enforcement implicate the Fourth Amendment in different ways. There are three types of interactions the United States Supreme Court and the Tenth Circuit have categorized between individuals and law enforcement: 1. consensual; 2. investigative or a limited and brief stop "supported by reasonable suspicion of criminal activity" (*Terry* stop); and 3. a seizure or arrest "supported by probable cause." *U.S. v. Mercado-Gracia*, 989 F.3d 829, 835 (2021) (recognizing the "three types of police-citizen encounters"; and the evolution of situations morphing from one type of encounter to another). The Fourth Amendment guarantees an individual's protection from "unreasonable searches and seizures," yet the Fourth Amendment is not implicated in consensual interactions or "brief investigative stops. . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" USCS Const. Amend. 4.; *Navarette,* 572 U.S. at 396 (quoting *U.S. v. Cortez*, 449 U.S. 411, 417-418 (1981); and citing to *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

**Consensual Encounters**

A consensual encounter is when a private citizen voluntarily cooperates in response to non-coercive questioning by law enforcement. *U.S. v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996). Consensual encounters between law enforcement and the public are reviewed by the totality of the circumstances. *Mercado-Gracia*, 989 F.3d at 836. To determine if the factors imply a seizure versus voluntary interaction, a "reasonable person" standard is applied to the public-individual. *Id.*

The Tenth Circuit has established "a non-exhaustive list of factors to be considered" when reviewing encounters between law enforcement and individuals. *Id.*

> [T]he location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Id.* (quoting and internal citations omitted). Yet, the Tenth Circuit "follows a bright-line rule that requires the driver's documents to be returned before the stop may be considered a consensual encounter." *Id.* (quoting *U.S. v.Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020)) (finding non-coercive questioning by law enforcement depends on whether a reasonable person would feel free to leave or terminate the conversation).

The Court finds that the initial encounter between Ranger Koschny and Mr. Henning was a consensual encounter. The ranger approached Mr. Henning outside, on foot, without any show of force in full view of other people. He asked Mr. Henning to step off the porch to talk to him and Mr. Henning voluntarily did so. The ranger did not touch or restrain Mr. Henning, nor did he use any show of force, such as a drawn weapon. He did not have his emergency lights going on his

patrol vehicle and used a conversational tone. These first few moments were a consensual encounter. Once Ranger Koschny asked for, received, and retained Mr. Henning's identification, the encounter was no longer consensual, but turned into an investigative detention which must be justified by a reasonable articulable suspicion.

### The Scope of an Investigatory Stop

The next level of citizen/law enforcement encounters is an investigatory detention. Following the guidelines set forth by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, law enforcement officers are allowed "brief investigative traffic stop[s,] when [the officer] has 'a particularized and objective basis for suspecting th[at] particular person stopped[,] of criminal activity.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *U.S. v. Cortez*, 449 U.S. 411, 417-418 (1981); and citing to *Terry v. Ohio*, 392 U.S. at 21-22) (when finding reasonable suspicion, an officer may make reasonable inferences that a registered owner and a driver of a particular vehicle are the same if there is nothing to negate that information); *see also Navarette v. California*, 572 U.S. 393, 396 (2014) (a traffic stop based on a 911 caller's eyewitness report is permissible under the totality of the circumstances and complies with the reasonable suspicion requirements for investigatory *Terry* stops). In determining if an officer has a reasonable suspicion to justify an investigative detention, a court is to look at the "totality of the circumstances." *U.S. v. Robinson*, 201 F.3d 449 (10th Cir. 1999).

The reasonable suspicion standard depends on "both the content of information possessed by police and the degree of reliability." *Navarette*, 572 U.S. at 397. Law enforcement may rely on the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" to determine if further investigation is warranted under the "totality of the circumstances." *Kansas*, 140 S. Ct. at 1188 (quoting *Navarette*, 572 U.S. at 402). A "mere

hunch" will not suffice for reasonable suspicion, but the proof needed of wrongdoing is considerably "less than [the standard] necessary for probable cause." *Kansas*, 140 S. Ct. at 1187; *see also Navarette*, 572 U.S. at 397. The Supreme Court "firmly reject[s] the argument that reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another person." *Navarette*, 572 U.S. at 397 (internal citation omitted).

In *Navarette*, the Supreme Court went on to decipher for law enforcement the different levels of reliability given to reporting parties. The Supreme Court found that a 911 caller-driver, who had just been run "off the roadway" by a specific vehicle—providing the color, make, model, and license plate number of the vehicle—relayed "eyewitness knowledge of the alleged dangerous driving," and established "significant support to the tip's reliability." *Id.* at 398-399.

In the current case, the eyewitness account provided as much information as the 911 caller in *Navarette* and was not actually anonymous. Here, the eyewitness called to report a silver GMC Sierra pickup truck—with a specific license plate number—swerving, leaving the roadway, running into a curb at the Mammoth Hotel, and proceeding into Lower Mammoth. Ranger Koschny was able to verify the information by investigating and finding the truck matching the description, with the specific license plate in the location it was allegedly headed. There were enough indicators that the 911 caller-witness "bore adequate indicia of reliability for [Ranger Koschny] to credit the caller's account." *Id.* "A driver's claim that another vehicle ran [] off the road…necessarily implies that the informant knows the other car was driven dangerously." *Id.* at 399. Furthermore, as in *Kansas*, Ranger Koschny approached with the knowledge of the registered

owner's name and initiated further investigation once he confirmed the name and person located near the truck were the same person. *Kansas*, 140 S. Ct. at 1188.

This case is inapposite to *J.L.*, relied upon by the Defendant for the proposition that anonymous calls are not reliable. In *J.L.*, law enforcement had received an anonymous report about a suspect illegally carrying a firearm. Law enforcement stopped and frisked the individual based solely on that information. The Supreme Court determined that the anonymous caller's lack of predictive information, in addition to the caller's lack of reliability or base of knowledge of the suspect did not provide enough justification for law enforcement to initiate a *Terry* stop without further investigation. *Florida v. J.L.*, 529 U.S. 266, 271 (2000). The facts in the case now before the Court are much more akin to *Navarette* than *J.L.* Here, Ranger Koschny followed his "commonsense approach, [and] appropriately recognize[d] certain driving behaviors as sound indicia of drunk driving." *Navarette*, 572 U.S. at 402 (internal citations omitted). Although some behaviors are spotted as vaguely related to drunk driving, the behaviors alleged in the current case are dangerous enough to justify further investigation by law enforcement "on suspicion of drunk driving." *Id.*; *see also* The Visual Detection of DWI Motorists (Mar. 2010), online at https://www.nhtsa.gov/sites/nhtsa.gov/files/808677.pdf (as visited Feb. 1, 2023) (The NHTSA provides a plethora of driving behaviors that "are strongly correlated with drunk driving"). Once Ranger Koschny verified Mr. Henning had been drinking by smell and physical anomalies, the ranger's investigation further solidified his reasonable suspicion that the Defendant could potentially be an impaired driver.

The Court finds that the information provided by the caller, even if the caller had actually been anonymous, was sufficiently reliable for the ranger to consider and conduct an investigative detention of Mr. Henning. But Ranger Koschny had even more information than what the caller

provided. During Ranger Koschny's consensual contact with Mr. Henning, Ranger Koschny also noted Mr. Henning was unsteady on his feet, had the smell of alcohol on his breath and his eyes were bloodshot and watery, possible indicators of intoxication.

In summary, this Court finds that the initial encounter between Ranger Koschny and Mr. Henning was consensual. Once, Ranger Koschny asked for, received, and retained Mr. Henning's identification, the encounter morphed into an investigative detention which was supported by a reasonable articulable suspicion based upon the totality of the circumstances that Mr. Henning was engaged in criminal activity. Therefore, the Motion to Suppress [ECF No. 22] is hereby DENIED.

**Motion to Suppress Search Warrant [ECF No. 23]**

In his Motion to Suppress Search Warrant Faulty and Stale [ECF No. 23], the Defendant requests suppression of "all evidence in this case" because the search warrant lacked probable cause and the information provided to the magistrate judge was stale by the time the warrant was signed. The Defendant argues the officers lacked particularized suspicion for the initial contact with Mr. Henning. So, all evidence derived from the illegal "stop" and issued search warrant should be suppressed. Defense points to an unreasonable delay of three plus hours between the initial contact and the search warrant being signed, making the Blood Alcohol Concentration [BAC] irrelevant to the time of driving. Defense makes the final argument that the search warrant was never executed, and the rangers failed to tell the Defendant that a blood draw was required because of the search warrant, therefore the lack of execution should be suppressed as well.

At the evidentiary hearing on December 16, 2022, the Defendant further argued that the failure of the rangers to execute the search warrant, coupled with the Defendant's motion, should suffice for the requirements under *Franks v. Delaware*. *Mot. Hr'g*, ECF. No. 44. The Court noted, such facts would go to the weight of the evidence derived from the search warrant, not the probable

cause determination for the search warrant itself. *Id*. Additionally, since no evidence was garnered by the search warrant, there would be nothing to suppress.

The Defendant fails to articulate his argument that the search warrant lacked probable cause beyond mere statements that it did so. The Defendant, throughout the hearing, kept insisting that the fact that Mr. Henning had claimed he opened the one beer found in his vehicle **after** he had stopped driving, would entirely negate, and make impossible a finding of probable cause for driving under the influence and so this entire case should be thrown out. The Court simply does not agree. Again, while these alleged facts may come into play at a trial in this matter, they do not entirely negate probable cause. Therefore, the Court finds the search warrant contained sufficient probable cause for its issuance.

In its Response, the Government asserts "the passage of time did not make the warrant stale." ECF No. 31. Additionally, as the Court recognized, the lack of any evidence derived from the search warrant means the analysis of stale information should be considered moot.

But, for argument's sake and potential future litigation, the Court will address whether the information contained in the search warrant was stale due to the three-plus hour delay in obtaining the search warrant. A search warrant is valid "only as long as the information in the [affidavit]…provides probable cause to believe the items sought will still be found in the place to be searched at the time the search is conducted." *U.S. v. Garcia,* 707 F.3d 1190, 1194 (10th Cir. 2013) (*citing U.S. v. Shomo*, 786 F.2d 981, 983 (10th Cir. 1986)). Whether or not information is stale depends upon the nature of the criminal activity, the length of time that has passed and the property to be seized. *Id*. Regarding stale information concerning the natural metabolization of alcohol in the bloodstream, in *Missouri v. McNeely*, 569 U.S. 141 (2013), the Supreme Court concluded that metabolization of alcohol in the bloodstream and blood testing requires a case-by-

case analysis based on the totality of the circumstances. *Id.* at 144. Furthermore, the Federal Rules of Evidence 402 allows "all relevant evidence [a]s admissible, unless otherwise prohibited by the Constitution, statute, or by court rule." *U.S. v. Wright*, 884 F. Supp. 400, 402 (D. Colo. 1995). While certainly the Court recognizes that the delay in this case would have certainly affected the results of any test, the delay does not negate the potential usefulness of that information. It was still possible that the Defendant's blood could have contained a measurable blood alcohol level, and if not, that information would have been useful as well.

As pointed out by the Government in the Response, the Defendant did not reference any case law, statute, or regulation that precludes admission of the results of a blood test from a warrant based on remoteness of time. Rather, blood test results and the time delay would have gone to the weight of the evidence. In addition, the Defendant provided no case law which would support his contention that **all** evidence in a case should be suppressed if a search warrant, which did not result in any evidence being seized, was later found to be invalid.

In summary, as to the Motion to Suppress Search Warrant Faulty and Stale, the Court finds the affidavit was not faulty and contained no material omission which would have affected the issuance of the warrant. The warrant contained sufficient probable cause. The delay in obtaining the warrant was not sufficient to make the warrant stale, and there was still a possibility that the item to be seized (the blood) contained evidence of a potential crime.

Therefore, the Motion to Suppress [ECF No. 23] is DENIED.

## Motion to Suppress Refusal and Contempt Right to Exculpatory Evidence Denied [ECF No. 24]

In the Motion to Suppress Refusal and Contempt—Right to Exculpatory Evidence Denied [ECF No. 24], the defense argues that any refusal by Mr. Henning to submit to a breath test should be suppressed and the charge dismissed because "Henning was not advised of his right to obtain

an independent blood test or exculpatory evidence as he was held in jail without the ability to post bond." ECF No. 24 at 3. By the same reasoning, the Defendant also requests the operating a vehicle while under the influence charge be dismissed as well. Of note in this case, defense also argues that the State of Wyoming's implied consent laws should apply and YNP's implied consent advisory is unconstitutional.[3]

The Government's Response cites to *U.S. v. Zimmerman*, 1:15-cr-00251-SWS, 116 F. Supp. 3d 1280 (D. Wyo. 2016), when dealing with a state's implied consent laws and the fact that they do not apply in cases where the jurisdiction is a federal special maritime and/or territorial area. ECF No. 31 at 9. As the Government points out, defense fails to mention the established case law in this jurisdiction, *Zimmerman* and *U.S. v. Fieldson*, No. 5:21-PO-605-NDF-1, 2022 U.S. Dist. LEXIS 181985 (D. Wyo. Sep. 29, 2022).

The U.S. District Court for the District of Wyoming has previously and repeatedly addressed similar arguments to those made here by the Defendant; first, in *U.S. v. Parrent* in 2012, then again in *U.S. v. Zimmerman* in 2016, and yet again in *U.S. v. Fieldson* in 2022. Of note, Mr. Henning's attorney was also counsel for the defendants in the prior three cases as well. Each of these cases involved individuals charged with driving under the influence in Yellowstone National Park, Mr. Zimmerman, in the Montana portion of the Park and the other two in the Wyoming portion.

Ms. Rebsom, as counsel for the defendant in *Parrent*, argued that the blood alcohol test results in that case should be suppressed because the officers did not properly advise the defendant of his right to refuse the test. Law enforcement admitted they had not read the defendant a consent

---

[3] An almost identical motion to suppress was filed by Henning's counsel in *U.S. v. Parrent*, 2:11-mj-00100-NDF, Def. Mot. to Suppress, ECF. No. 26 at 2-12 (D. Wyo. Dec. 19, 2011); *versus Henning*, ECF No. 24 at 10-21.

advisory or advised him of his right to refuse the test. *Parent*, 2:11-mj-00100-NDF, 2012 U.S. Dist. LEXIS 4370, at *6 (D. Wyo. Jan. 12, 2012). The defense argued that the court was required to "use Wyoming State law to determine if a [d]efendant's rights to Due Process or his Fifth Amendment right against self-incrimination were violated when officers failed to advise him of the implied consent laws of the State of Wyoming." *Id.* at *7-8. The Court ruled against defense's argument in that case finding that "federal implied consent law is applicable to all federal property" and Wyoming's implied consent warning was not applicable. *Id.* at *8 (*citing U.S. v. Love,* 141 F.R.D. 315 (D.Colo. 1992)).

Later, in *Zimmerman,* again as defense counsel, Ms. Rebsom argued that the blood test results in that case should be suppressed because, among other arguments, "the [d]efendant should have been advised of the Montana implied consent law" and "the federal implied consent advisement does not comply with constitutional requirements." *Zimmerman,* 116 F.Supp. at 1283. As in this case, the defendant relied on the *Shady Grove Orthopedic Associates* case for the proposition that state substantive law should apply. *Id.* at 1288. The Court made quick work of this argument, noting that the principles of *Shady Grove* have no application to a federal criminal case and citing to many jurisdictions holding that federal law governs the admissibility of evidence in federal court, specifically pointing to the Court's previous decision in this jurisdiction in the *Parent* case. *Id.* at 1288-89 ("Wyoming implied consent warning and its attendant procedural requirements are not applicable here . . . and [t]he same is equally true for the Montana implied consent law."). The Court further found that the federal implied consent law was constitutional, and the defendant had been advised accordingly. *Id.* at 1289-90. The Court denied the motion to suppress.

The denial of the motion in the *Zimmerman* case was appealed to the U.S. District Court for the District of Wyoming. The district judge affirmed the lower court's rulings in all respects. The District Court confirmed that the federal implied consent law complies with the constitutional requirements of Due Process. *Zimmerman*, 1:15-cr-00251-SWS, ECF No. 53, *12 (D. Wyo. June 15, 2016). The court rejected the argument that an independent test option is required for an implied consent law to be constitutional. *Id*. At *13. The important factors were that a defendant is "advised of his right to refuse the blood draw, … made aware of various consequences which would follow such refusal, including its use in court, as well as administrative procedures by the state issuing license." *Id*.

In 2022, as counsel in the *Fieldson* case, Ms. Rebsom filed a motion to suppress a blood alcohol test in that case because the defendant's due process rights were violated as well as the defendant's right to obtain exculpatory evidence, very similar to the arguments in this case. The defendant, yet again, attempted to cite to the *Shady Grove* case for the proposition that the Wyoming implied consent laws should be applied, and those laws were violated. *Fieldson*, No. L:21-PO-605-NDF-1, ECF No. 21, *3-4 (D. Wyo. Jan. 7, 2022). The Court, again, ruled that state law does not control the admissibility of evidence in a federal criminal case, citing to both *Parrent* and *Zimmerman*. *Id.* As to the defendant's claims of a *Brady* violation since he was not informed of the right to obtain an independent test, after a lengthy discussion, the Court found that under the federal implied consent law, the ranger was not required to inform a defendant of the right to a secondary test since that right did not exist under federal law and there was no indication that the prosecution had failed to disclose evidence in their possession. *Id.* at *5. Dissatisfied with the lower court's ruling, the defendant in *Fieldson*, filed an appeal to the U.S. District Court for the District of Wyoming.

In fact, Mr. Henning's motion in this case is almost exactly, word-for-word, the same argument made by defense counsel's Brief on Appeal of Denial of Motion to Dismiss for Due Process Violation and Exculpatory Violation. *Fieldson*, No. L:21-PO-605-NDF-1, ECF No. 43 (D. Wyo. Aug. 25, 2022). The District Court noted that the "Defen[se's] brief is difficult to follow. Fragmentary case citations, lack of proper formatting to distinguish case quotes from [d]efendant's argument, and lack of clarity in presenting the issues significantly complicate[d] the Court's task." *Fieldson*, No. L:21-PO-605-NDF-1, ECF No. 48, *5 (D. Wyo. Sept. 29, 2022). The same holds true here.

In the appeal, the District Court first addresses the defendant's arguments under *Brady v. Maryland*, that when the rangers did not advise him of his right to obtain an independent alcohol test, this was akin to withholding exculpatory evidence. *Id.* at *7. The Court noted in that case, as in this one, the "Defendant ignores *Zimmerman*, a case in which Magistrate Judge Carman denied a motion to suppress on the same theory" and further notes counsel represented that defendant as well. *Id.* The Court goes on to note the District Court's previous decision in *Zimmerman* and quotes from it at length again finding that the federal implied consent advisory is sufficient and constitutional, and that federal due process does not require an independent test be offered. *Id.* at *8-14. In *Fieldson*, the defendant is given the exact same implied consent as given to Mr. Henning in this case. *Id.* at *3. The Court rejected each argument raised by the defendant in that case and again, word-for-word, raised here. District Court Judge Freudenthal affirmed that decision on appeal, and this Court cannot improve upon her concise analysis of the law and will decline to repeat it in full but finds that holding to be persuasive in all respects. Ultimately, the Court found that the federal implied consent advisement is sufficient and constitutional. The advisement read to the defendant fully complied with the federal implied consent law and defense was unable to

produce any authority that an arrestee must be advised about the collection of evidence "that is not in the government's possession." *Id*. at *12.

The facts in Mr. Henning's case are nearly identical to *Fieldson*, other than Mr. Fieldson consented to a test and Mr. Henning refused. Therefore, this Court will make the same findings. In this case, the rangers fully complied with the federal implied consent law by reading the federal implied consent advisement. The federal implied consent law is constitutional and does not require that an arrestee be advised of a right to obtain an independent test as that right does not exist. In addition, no *Brady* violation occurred due to the ranger's failure to offer an independent test.

Finally, in *Fieldson*, the Court also, again addresses the claims made by defense counsel, again, that the Wyoming implied consent law should have been applied in that case. *Id*. at *14-15. The Court adopts the ruling in *Zimmerman* that state substantive law does not apply to criminal charges in federal courts. This Court makes this finding, again, in Mr. Henning's case.

As an additional observation, this Court is quite astounded by what appears to be defense counsel's lack of candor to this Court regarding the previous case law on these issues from Wyoming's U.S. District Court. In the Defendant's motion, neither *Parent*, nor *Zimmerman* (either the lower court's or District Court's rulings), nor *Fieldson* (either the lower court's or District Court's rulings) are mentioned anywhere nor were they presented or discussed in defense counsel's arguments at the motion hearing. These prior cases are directly on point, and it seems unlikely that Defendant's counsel forgot about her work in these prior cases. Ms. Rebsom has a professional responsibility to file actual meritorious claims and contentions under the Montana Rules of Professional Responsibility as a member of the Bar Association of Montana.[4] She also has a duty to disclose "legal authority in the controlling jurisdiction known to the lawyer to be

---

[4] *See* Rule 3.1: Meritorious Claims and Contentions.

*directly* a[verse] to the position of the client[.]"[5] When confronted by the Court about these cases, defense counsel's only response was that those cases were wrong and she should have appealed them. This response is not helpful to the Court. Counsel should not ignore previous rulings from cases with similar facts and circumstances and certainly this Court will not without good cause which the Defendant has not even attempted to articulate.

For the reasons stated above the Defendant's Motion to Suppress, ECF No. 24, is DENIED.

**Motion to Suppress Statements [ECF No. 25]**

In the Motion to Suppress Statements [ECF No. 25], defense argues that all statements after the few *Terry* roadside questions should be suppressed because Defendant's Fifth Amendment right was violated. The Defendant makes statements regarding omissions from the search warrant and its potential staleness as brought up previously. The Court does not find these statements relevant to the issue to be addressed here. Rather, the Court will focus on the issue of whether law enforcement had a duty to advise Mr. Henning of his *Miranda* and Fifth Amendment rights and if his rights were violated.

The Government's Response argues that *Miranda* warnings are only applicable in cases where the individual "is subjected to custodial police interrogation." ECF No. 31 at 12 (quoting *Miranda v. Arizona*, 384 U.S. 436, 439 (1966)). The Response notes that for an individual to fall within the established procedure under *Miranda*, the individual must be: (1) in-custody, and (2) be questioned and subjected to an interrogation. ECF No. 31 at 12 (citing *U.S. v. Perdue*, 8F. 3d 1455, 1463 (10th Cir. 1993)). Furthermore, the Government provides the objective test of whether *Miranda* applies, "given the circumstances surrounding the interrogation, [would] a reasonable

---

[5] Rule 3.3: Candor Toward the Tribunal

person [] have felt free to terminate the interrogation and leave"? ECF No. 31 at 12-13 (citing *Thompson v. Keohane*, 516 U.S. 99, 112-113 (1995)).

At the hearing, the Government argued that the questions and answers fell within the scope of consensual and voluntary statements or were permissible *Terry* stop questions up until the time he was told he was under arrest by Ranger Koschny. Yet, defense argued Mr. Henning should immediately be considered in-custody after the first few questions by the ranger.

### Investigatory Stops vs. In-custody and *Miranda*

As explained by the Court regarding the Motion to Suppress [ECF No. 22], *supra* at 10-16, the initial contact between Ranger Koschny and the Defendant was a consensual encounter. Shortly thereafter, it changed to an investigative detention when the ranger took Mr. Henning's driver's license and kept it. This investigative detention was supported by reasonable articulable suspicion. The encounter then changed to an in-custody arrest of the Defendant.

In *Berkemer v. McCarty*, 468 U.S. 420 (1984), the Supreme Court answered the question of "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered custodial interrogation." *Berkemer*, 468 U.S. at 435 (internal quotations omitted) (finding *Miranda* protections against self-incrimination do not apply to traffic stops similar to that in *Terry*; police are allowed to investigate further whether a crime is being committed and until "a suspect's freedom of action is curtailed to a degree associated with formal arrest[,]" *Miranda* safeguards will not apply. *Id*. at 440 (internal quotations omitted)). The Supreme Court's analysis recognized that traffic stops do implicate the Fourth Amendment protections; and went on to say, "a traffic stop [can] significantly curtail[] the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle," but Fifth Amendment protections will not be immediately implemented. *Id*. at 436. In *Berkemer*, this specifically applied to a law enforcement officer asking

a few questions and requesting a detained individual to perform a simple balancing test. *Id.* at 442. Additionally, the Tenth Circuit has found the same rubric applies to stops of pedestrians. *See Montgomery v. Brukbacher*, No. 21-1073, 2021 U.S. App. LEXIS 26970, at *6-7 (10th Cir. Sep. 8, 2021) (finding routine investigative stops by law enforcement for pedestrians will be analogous to an investigative detention rather than a custodial detention, falling outside *Miranda*.).

Defense argues the stop exceeded the scope of time allocated to investigate the crime of drunk driving. For Rangers Koschny and Lewis, the investigative seizure's mission was to determine whether the Defendant had violated the CFR by operating a vehicle while intoxicated, and to make sure Mr. Henning did not get back into his truck if he was intoxicated. *See Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015) (duration of investigative stops are "determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." (internal quotations omitted)). The entire length of the time between Ranger Koschny first contacting Mr. Henning, and Mr. Henning being told he was under arrest is almost exactly 30-minutes. The entire time the Defendant is detained for purposes of the investigation, Ranger Koschny is only focused on whether Mr. Henning had been drinking and driving. The Court is not convinced that *Miranda* applies to any point within those first 30-minutes. *See U.S. v. Dates,* 752 F. App'x 570, 578 (10th Cir. 2018) (the court only considers the totality of the circumstances from a reasonable person's perspective, not the "subjective views of the interrogating officers" (citing to *U.S. v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007)).

The Court finds this case is very similar to *Berkemer*. The investigatory detention of Mr. Henning was justified by a reasonable articulable suspicion. The stop was no longer than necessary for the ranger to complete his investigation of a possibly intoxicated driver and Mr. Henning was not in custody until he was told he was being placed under arrest by Ranger Koschny. After Mr.

Henning was arrested, the rangers do not conduct any type of interrogation of Mr. Henning and the Defendant failed to identify any specific statements after his arrest that should be subject to suppression.

Turning to Mr. Henning's refusal to take the breath test requested by Ranger Lewis, the Supreme Court has specifically found that a refusal to take a test to determine a blood alcohol level does not violate the privilege against self-incrimination. *South Dakota v. Neville,* 459 U.S. 553, 564 (1983). Therefore, Mr. Henning's post-arrest refusal to take the breath test is not subject to suppression.

Therefore, the Court finds *Miranda* safeguards did not apply to the initial 30-minutes of recorded interaction between the rangers and Mr. Henning prior to his formal arrest and that no interrogation of Mr. Henning occurred after his arrest. The Motion to Suppress Statements, ECF No. 25, is hereby DENIED.

## CONCLUSION

Based upon the foregoing the Court ORDERS that Defendant's Motion to Suppress for Lack of Particularized Suspicion [ECF No. 22] is DENIED; the Motion to Suppress Search Warrant Faulty and Stale [ECF No. 23] is DENIED; the Motion to Suppress Refusal and Contempt Right to Exculpatory Evidence [ECF No. 24] is DENIED; and Motion to Suppress Statements [ECF No. 25] is DENIED. The charges against him will not be dismissed.

DATED this 24th day of February, 2023.

*Stephanie Hambrick*
STEPHANIE A. HAMBRICK
U.S. Magistrate Judge